

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SHEZ JACKSON,

                   **Plaintiff,**

        **vs.**

STERLING METS, L.P., JEFFREY WILPON and
DAVID COHEN,

                  **Defendants.**

**CV 04 5407**

**COMPLAINT WITH
JURY DEMAND**

**Case No.**

FEUERSTEIN, J

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

DEC 13 2004

★ BROOKLYN OFFICE ★

MATSUMOTO, MAG

 

Plaintiff, Shez Jackson, by her attorneys, Tuckner, Sipser, Weinstock & Sipser, LLP complains as follows:

### NATURE OF THE CASE

1.    This is an action arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e et seq., 42 U.S.C. §§1981, The Fair Labor Standards Act of 1938 29 U.S.C. §206(d), as amended by The Equal Pay Act 29 U.S.C. §206(d), The Civil Rights Act of 1866, 42 U.S.C. §1981(a), New York Executive Law, §§296 et seq. and the New York City Administrative Code, Title 8, §§8-107 et seq. seeking declaratory and injunctive relief and damages to redress the injuries Plaintiff has suffered as a result of being discriminated against by and terminated by Defendants on the bases of her sex, race and color and in retaliation for complaining about discrimination.

1

Dockets.Justia.com

2.    The Court has jurisdiction pursuant to *42 U.S.C. §§2000e et seq.; 28 U.S.C. §1331, §1343* and pendent jurisdiction thereto with respect to the New York State and New York City claims.

3.    Venue is proper in this district because the unlawful employment practices alleged to have been committed occurred within the County of Queens, State of New York, Eastern District of New York. *42 U.S.C. §2000e-5(f)(3)*.

## PARTIES

4.    Plaintiff Shez Jackson is a African-American female who was employed by Sterling Mets, L.P. (also known as Sterling Doubleday Enterprises, L.P.), the parent company of the New York Mets Baseball Club located at Shea Stadium in Flushing, New York, as the Director of its Human Resources and Administration Department from April 10, 2000 to November 30, 2002.

5.    Defendant Sterling Mets, L.P. (hereinafter also described as the "Mets") is an "employer" as defined as defined in *42 U.S.C. §2000e(b)* that employs over 15 persons and is engaged in an industry affecting commerce.

6.    Defendant Jeffrey Wilpon is the Senior Executive Vice President and Chief Operating Officer for the Mets and the son of Chairman and Owner of the Mets, Fred Wilpon.

2

7.    Defendant David Cohen is a Senior Vice President and General Counsel for the Mets.

## PROCEDURAL PREREQUISITES

8.    In or about February 24, 2003, Plaintiff filed charges of race, color and sex-based discrimination and retaliation upon which this Complaint is based with the United States Equal Employment Opportunity Commission (hereinafter referred to as the "EEOC").

9.    Plaintiff received a Notice of Suit Rights from the EEOC dated September 14, 2004 with respect to the charge of race, color and sex discrimination as well as retaliation entitling her to commence a civil action under Title VII within 90 days of the receipt of that Notice. A copy of the Notice is annexed as exhibit "A".

10.    Written consent of the Plaintiff, as required by 29 U.S.C. Sec. 216(b), is being filed with the Court simultaneously with the filing of this complaint.

## MATERIAL FACTS

11.    Plaintiff, Shez Jackson, a woman of color, resides in Mt. Vernon, New York.

12.    Ms. Jackson (hereinafter also referred to as "Plaintiff"), has worked in a "human resource" capacity in salaried positions for over nine years. From April 10, 2000

3

through November 30, 2002, Plaintiff was employed by the Mets (Sterling Mets, L.P.,) which owns and manages the New York Mets baseball team.

13.     Plaintiff was placed at the Mets by Success Unlimited Staffing, a recruiting firm that informed her that the Mets were seeking to hire women and/or a minority. Plaintiff was offered a position at the Mets by Ray Scott, the former Human Resource Director. Soon after Plaintiff commenced her employment at the Mets, Mr. Scott stated that *"we've got you both ways now,"* referring to the Plaintiff being both female and black.

14.     As Director of Human Resources, Plaintiff was responsible for monitoring the Human Resources Department ("HR"), as well as all benefits and compensation decisions for non-contract employees. Ms. Jackson reported directly to senior management and the Board of Directors with respect to her management of more than ten million dollars in salaries and benefits and any and all issues related to her supervisory duties over a staff of seven people.

15.     In or about early January 2001, Ms. Jackson spoke with her manager, Senior Vice President David Howard, and requested a promotion to Vice President ("VP"). Ms. Jackson indicated that similarly situated employees at other baseball clubs with backgrounds and positions comparable to her own enjoyed the VP denomination as well as all the benefits, privileges and enhanced pay that attend

4

that corporate officer title. At that time, Mr. Howard indicated he supported Ms. Jackson's request for a promotion.

16.   Six weeks later, in or about March 2001, Mr. Howard informed Ms. Jackson that she would have to assume the management of centralized purchasing in order to obtain the VP title. Shortly thereafter, Ms. Jackson did indeed assume such management role. At the time, centralized purchasing was managed by VP Robert Mandt, a white male, who remained a VP even after relinquishing his responsibilities to Ms. Jackson.

17.   Mr. Howard assured Ms. Jackson that she would be elevated to VP if she were successful with purchasing. Soon after she agreed to take responsibility for purchasing, Mr. Howard informed Ms. Jackson that she would also be required to manage the switchboard and mail room in order to be considered for this promotion. As a result of these conditions, inducements and promises, Ms. Jackson undertook these additional responsibilities as well and was officially named the Director of Human Resources and Administration on or about March 27, 2001.

18.   Ms. Jackson successfully reformed the purchasing program and earned Mr. Howard's praise. However, Plaintiff's compensation was not increased, nor was she promoted to VP as promised to her.

5

19.    Plaintiff complained about her failure to be promoted to Mr. Howard and Mr. Harry O'Shaughnessy, Senior Vice President and Treasurer of the Mets. Plaintiff provided information that illustrated a significant disparity in the compensation paid to female as compared with comparator male employees. Ms. Jackson met with Mr. O'Shaughnessy and Mr. Howard and was offered half of what she requested as a quarterly bonus, contingent upon her performance.

20.    As indicated above, during the course of Ms. Jackson's employment, there was a disparity between similarly situated male and female compensation rates at the Mets. Ray Scott, the former Director of Human Resources who hired Ms. Jackson, received a salary of $91,900 at the time he left the Mets employ. However, Ms. Jackson's starting salary was $70,000, almost $19,000 less than the salary paid to Mr. Scott, although she had duties that were greater than those of Mr. Scott.

21.    In 2001, all baseball teams received a memo from the Major League Baseball Commissioner strongly encouraging them to properly consider minority job applicants, particularly on the "talent" or baseball side of the business. When Ms. Jackson brought the memo to the attention of Steve Phillips, a Mets Senior Vice President, and Jim Duquette, the Mets Senior Assistant General Manager, both men dismissed the issue, indicating that the Commissioner should first acquire a diversified staff before instructing them to hire minorities.

22.    On or about August 23, 2002, Fred Wilpon became an owner of the Mets. On or
       about August 26, 2002, Mr. Wilpon summoned Ms. Jackson to a meeting with
       senior management and board members, including Vice President and General
       Counsel David Cohen. At this meeting, Mr. Wilpon announced that he was
       moving the company in a new direction which may entail Ms. Jackson being
       compelled to relinquish her purchasing responsibilities.

23.    Ms. Jackson stated that she wanted to retain these responsibilities and that she
       felt she deserved a promotion to VP that year. Mr. Cohen by his demeanor
       indicated his disapproval and Mr. Wilpon then gratuitously advised Ms. Jackson
       that he believed in diversity before abruptly concluding the meeting.

24.    At around the same time, Fred Wilpon's son, Jeffrey Wilpon, became Executive
       Vice President and Chief Operating Officer of the Mets. Jeffrey Wilpon
       systematically devalued Mets' female employees by bringing in white male
       executives from a minor league baseball team also owned by the Wilpons to
       perform some of the job duties of Mets female employees Tina Bucciarelli
       (Director), Julia Knee (Director), and Jill Grabill (Manager).

25.    In or about early November 2002, Ms. Bucciarelli informed Ms. Jackson that the
       component of her work that deals with Aramark Food Services, a vendor that
       handles concessions, would be reassigned to a male by the name of R.C.

Reuterman, because the Mets indicated that a man would be more effective than she was with this client.

26.     At a company meeting on or about September 3, 2002, Fred Wilpon indicated that there would be no substantial changes at the Mets. Mr. Wilpon refused to effectuate Ms. Jackson's promised promotion (and commensurate pay raise) to VP.

27.     Later in the month, Ms. Jackson was transferred from one supervisor to another, crystallizing the severe hostility that she had been experiencing on account of her race, color and sex. It became clear to Ms. Jackson that she would never receive the promotion and raise that would befit her experience and skill set. None of the white men who were part of Mets management were transferred.

28.     On or about September 10, 2002, Mr. Howard briefly exited a meeting he was in to pose several inquiries to Ms. Jackson with respect to the Mets' human resource policies. Ms. Jackson asked if she should attend the meeting to answer any such questions, but Mr. Howard answered *"it's just Jeff [Wilpon] meeting with the guys."* Perceiving dismay in Ms. Jackson's reaction to his comment, Mr. Howard added *"it's just a meeting with the VPs and above."*

8

29.    No women or minorities have ever held the title of VP or above on the "business"
       side of the Mets. On the baseball side, only one Hispanic man, Omar Minaya,
       has ever held a title equivalent to the business VP title. However, even in that
       instance, when Mr. Duquette, a white male, was promoted to the same title as
       Mr. Minaya, Mr. Duquette was paid more.

30.    On or about September 13, 2002, Karl Smolarz, a white male, who is VP of
       Facilities, called Ms. Jackson to look at the pantry area on the second floor of the
       Mets administrative offices at Shea Stadium, assuming that she was responsible
       for the cleaning. Ms. Jackson informed him that since he was VP of Facilities,
       these matters were his responsibilities. Jeffrey Wilpon overheard the
       conversation, pointed a finger close to Ms. Jackson's face while shouting at her
       that she was in fact responsible for removing used kitchen utensils and a serving
       tray from the pantry area.

31.    Ms. Jackson informed Mr. Smolarz and Jeffrey Wilpon that she found Mr.
       Wilpon's actions offensive and demeaning, to which Jeffrey Wilpon responded
       that he was disinclined to care. In an attempt to resolve the situation, Ms.
       Jackson suggested that the Office Administrator assume responsibility for
       cleaning the pantry area.

32.   In response, Jeffrey Wilpon insisted that it was Ms. Jackson's responsibility to clean the pantry. Mr. Wilpon then ordered Ms. Jackson to personally accomplish the cleaning. However, Mr. Wilpon finally permitted Ms. Jackson to delegate the cleaning to someone else after she continued to protest this blatantly discriminatory action.

33.   As a result of the discriminatory actions she was subjected to, Ms. Jackson complained to Mets management on or about September 16, 2002 and September 17, 2002, stating specifically that she was the victim of disparate treatment.

34.   On or about September 16, 2002, Mr. Howard, Ms. Jackson's supervisor at the time, advised Ms. Jackson that she might be transferred, which would result in her reporting to Mr. Cohen. Mr. Smolarz, a white male, would be slated to assume the purchasing role from her.

35.   At that same meeting with Mr. Howard, Ms. Jackson indicated to him that she had several concerns about her role at the Mets. Ms. Jackson cited a number of matters, including the "pantry cleaning" incident, the reassignment of the purchasing department, and the fact that none of her male counterparts were being required to transfer and report to a new supervisor.

10

36.     Ms. Jackson pointed out that if she reported to a VP, it was unlikely that she
        would be promoted to VP in the near future. Ms. Jackson reminded Mr. Howard
        of his promise in March 2001 that if she undertook additional responsibilities she
        would be promoted to VP.

37.     Ms. Jackson also told Mr. Howard that she was not advancing within the Mets
        organization due to what she believed was disparate and unfair treatment. Ms.
        Jackson noted that all the top managers were white men, compared with her, a
        woman and a minority. Mr. Howard responded that if Ms. Jackson was unhappy
        with her treatment by the Mets, she had options.

38.     On or about September 17, 2004, Mr. Cohen met with Ms. Jackson to confirm
        that she would be reporting to him. On or about October 24, 2002, Mr. Cohen
        contacted Ms. Jackson at about 9:00 a.m. and scolded her because there was
        not enough cereal in the pantry area. Mr. Cohen stated, *"Dave Howard said this
        is an absolute disaster."*

39.     Ms. Jackson informed Mr. Cohen that an administrative assistant who arrived
        daily at 9:30 a.m. handled the breakfast cereal issue. However, Mr. Cohen
        indicated that he wanted Ms. Jackson, (the Director of Human Resources and
        Administration), to personally ensure that breakfast cereal was available at 8:30
        a.m. each and every morning. Ms. Jackson suggested that the receptionist, who

11

arrived daily at 8:30 a.m., would probably be a more suitable employee to manage the cereal and other related morning consumables.

40.    However, due to Mr. Cohen's persistent exhortations, Ms. Jackson personally brought back cereal and containers in which it might be stored.  Mr. Cohen telephoned Ms. Jackson the same afternoon to complain that the containers *"poured out only one or two Cheerios at a time."* When Ms. Jackson advised him that the lids were removable, Mr. Cohen indicated that he did not want to take that particular action as *"the cereal could spill."*

41.    Ms. Jackson was compelled to find and purchase different cereal containers. The incident, as well as Ms. Jackson, became an office joke that remained a profound embarrassment to Ms. Jackson during the remainder of her employment at the Mets.

42.    Further, Ms. Jackson was called a number of times by Mr. Smolarz and/or Jeffrey Wilpon to check pantry areas to make sure that food-related stock items were available.

43.    On or about November 11, 2002, Ms. Jackson held a class at Shea Stadium with Mr. Cohen's permission.  Mr. Cohen had given Ms. Jackson permission one week earlier to take the class onto the playing field.  Kevin McCarthy, the

Director of Stadium Operations, volunteered to give the class a tour of the field and the Clubhouse.

44. Ms. Jackson escorted her class to the field, but Mr. McCarthy was unable to meet with the class. However, Mr. McCarthy left Ms. Jackson the keys to the field and the Visiting Clubhouse, where the class was to be held. Mr. McCarthy's colleague led the class tour, during which Ms. Jackson asked whether she could show the class the Clubhouse. Mr. McCarthy's colleague had the "watchman," Frank Leone, open the door and took the class in for a tour.

45. The next day, on or about November 12, 2002, Mr. Cohen indicated that he was upset with Ms. Jackson for taking the class into the Clubhouse and warned her that she must let him know in advance next time.

46. Ms. Jackson later learned that Mr. Cohen spoke to both Mr. McCarthy and Mr. Leone in relation to the tour. However, both Mr. McCarthy and Mr. Leone informed Mr. Cohen that there had been no wrongdoing on Ms. Jackson's part.

47. After discussing the Clubhouse tour, Mr. Cohen began berating Ms. Jackson for other alleged incidents where *"she had not shown appropriate discretion."* However, the incidents he mentioned were either completely falsified, or resulted from someone else's conduct.

13

48.   Mr. Cohen confronted Ms. Jackson with these false allegations again on November 14, 2002 and added another new allegation. Previously, Mr. Cohen informed Ms. Jackson that Fred Wilpon wanted employees to adopt a more corporate style of dress, and directed that Ms. Jackson create a dress code for the company. Lisa Favata, an Administrator, helped Ms. Jackson gather information to create a dress code.

49.   Subsequently, Mr. Cohen and Ms. Jackson met to discuss the proposed dress code. In that meeting, the wardrobes of various employees were discussed. Mr. Cohen said that he did not approve of Ms. Favata's wardrobe. Ms. Jackson indicated that Ms. Favata may have difficulty finding more "corporate" oriented clothing due to her weight challenges. She suggested that Ms. Favata's weight be taken under advisement.

50.   Mr. Cohen responded that Ms. Favata's clothing appeared to be made from "T-shirt," fabric. He indicated that she must wear clothing that would comport more closely with a corporate environment. Subsequent to this meeting, Ms. Jackson was compelled to inform Ms. Favata that she would have to change her attire to remain in harmony with the Mets' new "corporate dress code." During Ms. Jackson's meeting with Mr. Cohen on or about November 14, 2002, he unfairly accused Ms. Jackson of invoking his name when Ms. Jackson directed Ms. Favata to adopt more corporate-style clothing.

14

51.    In that same meeting, Mr. Cohen also said that Mr. Phillips had stated that Ms.
       Jackson had told Denise Morris, his secretary, that Mr. Phillips had said every
       employee deserved a raise except her.

52.    However, Ms. Morris had known at least a month earlier that she would not
       receive a raise because Mr. Phillips had advised her of this in Ms. Jackson's
       presence during her substandard performance evaluation. Despite this, Mr.
       Cohen persisted in his criticism of Ms. Jackson and said that the situation
       demonstrated her lack of good judgment and discretion.

53.    During Ms. Jackson's November 14, 2002 conversation with Mr. Cohen, she
       noticed that he had a list on his desk of employees with whom he had been
       speaking about her. At the end of this discussion, Mr. Cohen said that he would
       write Ms. Jackson up for this and the other incidents he had described on
       November 12, 2002..

54.    At the conclusion of the November 14, 2004 meeting, Ms. Jackson asked Mr.
       Cohen for an opportunity to respond in writing to all of his allegations against her.
       Mr. Cohen agreed to review her written submissions before he took any action.

55.    Notwithstanding these assurances, on or about November 26, 2002, Mr. Cohen
       and Mets Controller Leonard Labita, met with Ms. Jackson before she was able

15

to forward to Mr. Cohen any written submissions. She was then informed that the Mets were terminating her employment.

56. At this meeting Mr. Cohen stated that the termination had nothing to do with her performance as Human Resources Director. Mr. Cohen further stated that he could not trust Plaintiff and that the decision to terminate her employment had come from a higher authority within the Mets organization.

57. Mr. Cohen then attempted to convince Ms. Jackson to resign, saying she could tell prospective employers that she was unhappy with the Mets because she knew she was losing responsibility for centralized purchasing, even though that was an untrue statement as she had never been informed of any final decision to remove those job responsibilities from her.

58. Only subsequent to Ms. Jackson's termination did the Mets transfer the purchasing function to Mr. Smolarz, who is a white male.

59. On or about November 26, 2002, Mr. Cohen gave Ms. Jackson a termination letter dated November 26, 2002, which stated that her termination would be effective November 30, 2002 when her benefits would cease. The November 26, 2002 letter promised her the unpaid portion of her salary through that date,

16

reimbursement of outstanding business expenses, compensation for accrued vacation and a modest severance payment.

60.   The November 26, 2002  termination letter stated that it must be executed no later than December 2, 2002 and offered her the option of resigning and signing an attached nine-page agreement that included a release of any claims she had against the Mets.  Ms. Jackson did not sign the agreement.  Thereafter, the Mets paid Ms. Jackson only for her accrued vacation.  Moreover, the Mets baselessly contested Ms. Jackson's claims for unemployment insurance benefits.

61.   Upon information and belief, the Mets pay their female and minority employees, including Ms. Jackson, less than their male and/or white counterparts.  During Ms. Jackson's employment at the Mets, the eighteen highest-compensated employees on the business or "non-talent" side of the company were all men.

62.   Eight male non-officers were paid more than Ms. Jackson.  Nevertheless, Ms. Jackson was the highest-paid woman at the Mets and the second highest-paid minority on the business side.

63.   The Mets discriminated against Ms. Jackson because of her sex, race and color, and retaliated against her for complaining about discrimination. The Mets also repeatedly and willfully violated Section 206 of the Equal Pay Act of 1963 by

17

paying higher wages to male employees for equal work on jobs that require equal skill, effort, responsibility, and are performed under similar working conditions.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII

64.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1) provides that it shall be an unlawful employment practice for an employer

> " . . . discharge any individual, or otherwise discriminate against    any    individual . . . because of such individual's race ..."

65.  Defendant Mets engaged in an unlawful employment practice prohibited by 42 U.S.C. §2000e-2(a)(1) by terminating and otherwise discriminating against Plaintiff because of her race.

## AS A SECOND CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII

66.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2(a)(1) provides that it shall be an unlawful employment practice for an employer

"to . . . discharge any individual, or otherwise discriminate against any individual . . . because of such individual's...color ..."

67. Defendant Mets engaged in an unlawful employment practice prohibited by 42 U.S.C. §2000e-2(a)(1) by terminating and otherwise discriminating against Plaintiff because of her color.

## AS A THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII

68. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2(a)(1) provides that it shall be an unlawful employment practice for an employer:

" to . . . discharge any individual, or otherwise discriminate against any   individual . . . because of such individual's sex ..."

69. Defendant Mets engaged in an unlawful employment practice prohibited by 42 U.S.C. § 2000e-2(a)(1) by terminating and otherwise discriminating against Plaintiff because of her sex.

## AS A FOURTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII

70. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be an unlawful employment practice for an employer.

"to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified,

assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

71.    Defendant Mets engaged in an unlawful employment practice prohibited by 42

U.S.C. §2000e-3(a) by terminating and otherwise discriminating against Plaintiff

because she opposed Defendants' unlawful employment practices and because

she complained about employment discrimination against Defendants.

## AS A FIFTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER UNDER §1981

72.    The Thirteenth Amendment to the Constitution as protected by 42

U.S.C. §1981(a) provides:

> "All persons within the jurisdiction of the United States shall have
> the same right in every State and Territory to make and enforce
> contracts, to sue, be parties, give evidence, and to the full and
> equal benefit of all laws and proceedings for the security of persons
> and property as is enjoyed by white persons, and shall be subject
> to like punishment, pains, penalties, taxes, licenses, and exactions
> of every kind, and to no other."

73.    Defendant Mets engaged in an unlawful employment practice prohibited by 42

U.S.C. §1981(a) by terminating and otherwise discriminating against Plaintiff

because of her race and retaliating against her because she opposed

Defendants' unlawful employment practices and because she filed a complaint of

employment discrimination against Defendants.

20

## AS A SIXTH CAUSE OF ACTION
## UNDER THE EQUAL PAY ACT OF 1963

74.    Section 206 of the Equal Pay Act of 1963 provides no employer shall

discriminate against:

> "employees on the basis of sex by paying wages to
> employees in such establishment at a rate less than the rate
> at which he pays wages to employees of the opposite sex in
> such establishment for equal work on jobs the performance
> of which requires equal skill, effort, and responsibility, and
> which are performed under similar working conditions,"

75.    Defendant Mets engaged in an unlawful employment practice prohibited by

Section 206 of the Equal Pay Act of 1963 by paying Plaintiff wages at a rate less

than the rate at which it pays wages to employees of the opposite sex for equal

work in jobs that require the same performance in terms of equal skill, effort, and

responsibility.

## AS A SEVENTH CAUSE OF ACTION
## UNDER THE EQUAL PAY ACT OF 1963

76.    Section 215(a)(3) of the Fair Labor Standards Act provides that it shall be an

unlawful employment practice to:

> "...discharge or in any other manner discriminate against any
> employee because such employee has filed any complaint
> or instituted or caused to be instituted any proceeding under
> or related to this chapter, or has testified or is about to testify
> in any such proceeding, or has served or is about to serve
> on an industry committee"

21

77.    Defendant Mets engaged in an unlawful employment practice prohibited by

Section 215(a)(3) of the Fair Labor Standards Act by terminating and otherwise

discriminating against the Plaintiff because she complained about employment

discrimination by the Mets.

## AS AN EIGHTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

78.    New York State Executive Law § 296(1)(a) provides that it shall be an unlawful

discriminatory practice:

> "For an employer . . . because of . . . race . . . of any individual . . .
> to discharge from employment such individual or to discriminate
> against such individual in...terms, conditions or privileges of
> employment."

79.    Defendant Mets engaged in an unlawful discriminatory practice by terminating

and otherwise discriminating against Plaintiff because of her race.

## AS A NINTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

80.    New York State Executive Law § 296(1)(a) provides that it shall be an unlawful

discriminatory practice:

> "For an employer . . . because of . . . color . . . of any individual . . .
> to discharge from employment such individual or to discriminate
> against such individual in...terms, conditions or privileges of
> employment."

22

81.     Defendant Mets engaged in an unlawful discriminatory practice by terminating
and otherwise discriminating against Plaintiff because of her color.

## AS A TENTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

82.     New York State Executive Law § 296(1)(a) provides that it shall be an unlawful
discriminatory practice:

> "For an employer . . . because of . . . sex . . . of any individual . . . to
> discharge from employment such individual or to discriminate
> against such individual in...terms, conditions or privileges of
> employment."

83.     Defendant Mets engaged in an unlawful discriminatory practice by terminating
and otherwise discriminating against Plaintiff because of her sex.

## AS AN ELEVENTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

84.     New York State Executive Law § 296(1)(e) provides that it shall be an unlawful
discriminatory practice:

> "For an employer. . .to discharge, expel or otherwise discriminate
> against any person because he has opposed any practices
> forbidden under this article or because he has filed a complaint,
> testified or assisted in any proceeding under this article."

85.     Defendant Mets engaged in an unlawful discriminatory practice by terminating
and otherwise discriminating against Plaintiff because she opposed Defendants

unlawful employment practices and because she filed a complaint of

employment discrimination against Defendants.

### AS A TWELFTH CAUSE OF ACTION
### FOR DISCRIMINATION UNDER STATE LAW

86.    New York State Executive Law §296(6) provides that it shall be an unlawful

discriminatory practice:

> "For any person to aid, abet, incite, compel or coerce the doing of any
> acts forbidden under this article, or to attempt to do so."

87.    Defendants Jeffrey Wilpon and David Cohen engaged in an unlawful

discriminatory practice in violation of New York State Executive Law §296(6) by

aiding, abetting, inciting, compelling and coercing the discriminatory employment

practices suffered by Plaintiff.

### AS A THIRTEENTH CAUSE OF ACTION
### FOR DISCRIMINATION UNDER THE
### NEW YORK CITY ADMINISTRATIVE CODE

88.    The New York City Administrative Code Title 8 § 8-107(1)(a) provides that it shall

be an unlawful discriminatory practice:

> "For an employer . . . because of . . . race...of any person . . . to . . .
> discharge from employment such person or to discriminate against
> such person...in terms, conditions or privileges of employment"

24

89.    Defendant Mets engaged in an unlawful discriminatory practice in violation of

New York City Administrative Code, Title 8 §8-107(1)(a) by terminating and

otherwise discriminating against Plaintiff because of her race.

## AS A FOURTEENTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE
## NEW YORK CITY ADMINISTRATIVE CODE

90.    The New York City Administrative Code Title 8 § 8-107(1)(a) provides that it shall

be an unlawful discriminatory practice:

> "For an employer . . . because of . . .color...of any person . . . to . . .
> discharge from employment such person or to discriminate against
> such person...in terms, conditions or privileges of employment"

91.    Defendant Mets engaged in an unlawful discriminatory practice in violation of

New York City Administrative Code, Title 8 §8-107(1)(a) by terminating and

otherwise discriminating against Plaintiff because of her color.

## AS A FIFTEENTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE
## NEW YORK CITY ADMINISTRATIVE CODE

92.    The New York City Administrative Code Title 8 § 8-107(1)(a) provides that it shall

be an unlawful discriminatory practice:

> "For an employer . . . because of . . .sex...of any person . . . to . . .
> discharge from employment such person or to discriminate against
> such person...in terms, conditions or privileges of employment"

93.     Defendant Mets engaged in an unlawful discriminatory practice in violation of

        New York City Administrative Code, Title 8 §8-107(1)(a) by terminating and

        otherwise discriminating against Plaintiff because of her sex.

### AS A SIXTEENTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

94.     The New York City Administrative Code Title 8 §8-107(1)(e) provides that it shall

        be an unlawful discriminatory practice:

> "For any employer...to discharge, expel or otherwise discriminate
> against any person because such person has opposed any
> practices forbidden under this chapter or because such person has
> filed a complaint, testified or assisted in any proceeding under this
> chapter."

95.     Defendant Mets engaged in an unlawful discriminatory practice in violation of

        New York City Administrative Code Title 8 §8-107(1)(e) by terminating and

        otherwise discriminating against Plaintiff because she has opposed practices

        forbidden under this chapter and because she filed a complaint of employment

        discrimination against Defendants.

### AS A SEVENTEENTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

96.     The New York City Administrative Code Title 8 §8-107(6) provides that it shall be

        an unlawful discriminatory practice:

26

> "For any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so."

97. Defendants Jeffrey Wilpon and David Cohen engaged in an unlawful discriminatory practice in violation of New York City Administrative Code, Title 8 §8-107(6) by aiding, abetting, inciting, compelling and coercing the discriminatory employment practices suffered by Plaintiff.

## AS AN EIGHTEENTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

98. The New York City Administrative Code Title 8 §8-107(19) provides that it shall be an unlawful discriminatory practice:

> "For any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of...any right granted or protected pursuant to this section."

99. Defendants Jeffrey Wilpon and David Cohen engaged in an unlawful discriminatory practice in violation of New York City Administrative Code, Title 8 §8-107(19) by coercing, intimidating, threatening and interfering with and attempting to coerce, intimidate, threaten and interfere with Plaintiff's exercise and enjoyment of her rights granted and protected pursuant to this section.

27

## INJURY AND DAMAGES

100. As a result of the Defendants' unlawful discriminatory employment practices, Plaintiff Shez Jackson has suffered injury to her reputation, and mental, emotional, and physical distress in addition to extreme pain and suffering.

## REMEDY

**WHEREFORE**, Plaintiff requests a judgment against the Defendants:

A.    Declaring that Defendants engaged in an unlawful employment practice prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et. seq.,* The Fair Labor Standards Act of 1938, 29 U.S.C. §206(d), as amended by The Equal Pay Act, 29 U.S.C. §206(d), 42 U.S.C. §1981(a), New York State Executive Law §§296 *et. seq.* and New York City Administrative Code Title 8 §§8-107 *et. seq.* by terminating or otherwise discriminating against and retaliating against Plaintiff;

B.    Reinstating Plaintiff to her former job and/or awarding future income to the Plaintiff in an amount to be proven representing all loss of future earnings, including reasonable and expected increases, loss of retirement income and all other benefits she would have expected to earn during her entire lifetime had it not been for Defendants' unlawful discharge of her employment;

28

C.  Awarding damages to the Plaintiff and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

D.  Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven at trial;

E.  Awarding Plaintiff punitive damages;

F.  Awarding Plaintiff attorneys' fees, costs and expenses incurred in the prosecution of the action;

G.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

H.  Awarding Plaintiff liquidated damages in an amount to be authorized by Section 16 (b) and Section 6(d)(3) of the Fair Labor Standards Act;

I.  Awarding Plaintiff such and other relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.


## JURY DEMAND

J.  Plaintiff demands a trial by jury.


29

Dated:    New York, New York
            December 10, 2004

**TUCKNER, SIPSER, WEINSTOCK &
SIPSER, LLP**

By:

William J. Sipser (WS 1781)
Attorneys for Plaintiff
120 Broadway, 18th Floor
New York, New York 10271
(212)-766-9100